UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------X
UNITED STATES OF AMERICA          :
                                  :
             v.                   :    NO. 3:07CR285 (EBB)
                                  :
RICHARD RIVERA,                   :
                                  :
          Defendant.              :
-----------------------------------X
```

## RULING ON DEFENDANT'S MOTION TO SUPPRESS

Defendant Richard Rivera has moved to suppress physical evidence seized during a search of his car, statements taken from him after his arrest, and additional physical evidence uncovered as a result of the statements he made. For the following reasons, the motion [Doc. No. 24] is DENIED.

## FACTUAL BACKGROUND

There is no dispute about the facts relevant to this ruling. For the purposes of the motion, both parties assume the truth of the facts set forth in reports produced by law enforcement officers in connection with this case. The defendant contends that, "even under the agents' version of events," he is entitled to suppression of the evidence. (Def.'s Mem. in Supp. at 1; see also Def.'s Reply at 1.) For this reason, the following statement of facts is drawn from the DEA "Report of Investigation" and from the Manchester Police Department "Crime/Incident Report," both of which are signed by DEA Task Force Agent John Rossetti. (See Def.'s Mem. in Supp., Exs. A, B.)

1

On October 17, 2007, a "confidential source" ("CS") informed Agent Rossetti that one James Scott was preparing to conduct a transaction involving a large quantity of crack cocaine in Manchester, Connecticut. The CS described Scott as a "clean cut" white male and told Rossetti that Scott was a fugitive. According to the CS, Scott was in possession of approximately nine ounces of crack cocaine. Agent Rossetti was able to confirm that a convicted felon named James Scott was at that time wanted after escaping from a halfway house.

The CS told Rossetti that Scott would be in the parking lot of a particular Olive Garden restaurant in Manchester. The CS first said that the "deal should go promptly" at 10:00 a.m. on October 17, 2007, but later the CS told Rossetti that the transaction had been postponed until 10:00 a.m. the following day due to the distance that Scott would need to drive from his current location. According to Rossetti's report, the CS told Rossetti that Scott would be the "passenger inside of a wagon" but was not able to describe the vehicle in any greater detail.

On October 18, DEA agents, together with officers from the Manchester Police Department, set off for the Olive Garden to await Scott's arrival. When the surveillance units arrived at the Olive Garden, they observed a man matching Scott's description standing beside a blue station wagon and talking to an individual seated in the driver's seat of the vehicle. Rossetti determined, based on a

comparison with a photograph he had located, that the man was indeed the fugitive Scott. This identification was further confirmed when, at a prearranged time, the CS telephoned Scott and the officers observed that Scott appeared to be speaking on a cell phone. At the time, the Olive Garden restaurant was closed and, as a result, there were "only a few" other cars in the parking lot.

At this point, the officers had no information about the driver of the wagon who later turned out to be defendant Rivera. The officers approached the blue station wagon, ordered Scott and Rivera to the ground, and handcuffed both men. Scott identified himself and was told that he was being arrested on a warrant. Scott was then placed in a marked police car.

A drug-sniffing dog was brought to the wagon and it conducted an examination of the exterior of the vehicle. The dog alerted officers to the presence of narcotics by scratching at the area around the driver's side door handle. The officers then directed the dog to examine the inside of the vehicle. The dog alerted officers to the glove box, where a bag of marijuana was discovered, and to the area under a speaker box in the rear of the vehicle, where a quantity of crack cocaine was discovered. Officers also discovered a quantity of U.S. currency in the car. Rivera seeks to suppress these items.

Rivera was taken to the police station, where he was informed of his <u>Miranda</u> rights. Rivera waived his rights and made the

statements that he now seeks to suppress. Rivera told the officers, among other things, that there was additional cocaine in the hotel room that he had been sharing with Scott in Maine. Rivera provided written consent for the officers to search this hotel room. A subsequent search of the hotel room uncovered additional physical evidence that Rivera now seeks to suppress.

DISCUSSION

A.  Physical Evidence Found in the Blue Wagon

The Fourth Amendment protects "against unreasonable searches and seizures." "It is basic Fourth Amendment jurisprudence that when the Government seeks to intrude upon an individual's legitimate expectations of privacy, it must either obtain a warrant from a neutral magistrate or bring its search within one of the few 'jealously and carefully drawn' exceptions to the warrant requirement." United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981) (quoting Jones v. United States, 357 U.S. 493, 499 (1958)), cert. denied, 454 U.S. 830 (1981); see also Katz v. United States, 389 U.S. 347, 357 (1967). The exception applicable in this case, the so-called "automobile exception," allows police to conduct a warrantless search of "an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." California v. Acevedo, 500 U.S. 565, 580 (1982).

Rivera argues that the search of his car violated the Fourth

4

Amendment because the officers lacked probable cause to believe that he was involved in any criminal activity at the moment when they ordered him out of his vehicle and handcuffed him on the ground. He relies on the principle that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." See Ybarra v. Illinois, 444 U.S. 85, 91 (1979).

Rivera is incorrect, however, in claiming that probable cause was required when the officers initiated this encounter. In the absence of probable cause, the police are permitted, based on "reasonable suspicion to believe that criminal activity "'may be afoot,'" to detain a vehicle and its occupants for the purpose of conducting a "brief investigatory stop[]." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968))); see also New York v. Class, 475 U.S. 106, 116 (1986). Like all Terry-stops, the investigative stop of a vehicle allows only for the use of reasonable investigative techniques that are "necessary to effectuate the purpose of the stop . . . [and] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." United States v. Gori, 230 F.3d 44, 56 (2d Cir. 2000) (quoting Florida v. Royer, 460 U.S. 491, 500-01 (1983)), cert. denied, Pichardo v. United States, 534 U.S. 824 (2001); see also United States v.

Sharpe, 470 U.S. 675, 685-88 (1985).

Courts have routinely held that "[o]fficers with reasonable suspicion to believe that the occupants of a vehicle are engaged in the unlawful transportation of contraband may detain the vehicle for a reasonable time to obtain a properly trained dog to sniff for contraband." See United States v. Mendoza, 468 F.3d 1256, 1260 (10th Cir. 2006); United States v. Davis, 430 F.3d 345 (6th Cir. 2005) (finding that, following the completion of a traffic stop, reasonable suspicion of narcotics related activity justified detaining a motorist for "the additional approximately thirty to forty-five minutes it took" for a drug-sniffing dog to arrive at the scene); United States v. Foreman, 369 F.3d 776, (4th Cir. 2004); United States v. Fuse, 391 F.3d 924, 930 (8th Cir. 2004); cert denied, 544 U.S. 990 (2005); United States v. Wyatt, 133 Fed. Appx. 310, 314 (7th Cir. 2005); United States v. Marquez, 127 Fed. Appx. 570, 571 (3d Cir. 2005); see also United States v. Place, 462 U.S. 696 (1983) (holding that officers who reasonably suspected that a traveler's luggage contained narcotics were permitted to seize the luggage and subject it to examination by a drug-sniffing dog).

The cases Rivera cites in which courts have found for defendants based on the principle that "mere propinquity" alone is insufficient involved searches that required probable cause, not reasonable suspicion. See, e.g., United States v. Di Re, 332 U.S.

581 (1948); <u>United States v. Bazinet</u>, 462 F.2d 982 (8th Cir. 1972); <u>United States v. Everroad</u>, 704 F.2d 403 (8th Cir. 1983); <u>United States v. Butts</u>, 704 F.2d 701 (3d Cir. 1983); <u>United States v. Barber</u>, 557 F.2d 628 (8th Cir. 1977); <u>United States v. Chadwick</u>, 532 F.2d 773 (1st Cir. 1976); <u>United States v. Linnear</u>, 464 F.2d 355 (9th Cir. 1972); <u>United States v. Seay</u>, 432 F.2d 395 (5th Cir. 1970). These cases are distinguishable because the officers in this case needed only reasonable suspicion to conduct an investigative detention of Rivera and his blue wagon.

An investigative stop must be based on "'specific articulable facts, [that] together with rational inferences from those facts, [] reasonably warrant suspicion that the individual stopped was engaged in criminal activity." <u>United States v. Alexander</u>, 907 F.2d 269, 272 (2d Cir. 1990) (quoting <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 884 (1975), citing <u>Terry</u>, 392 U.S. at 21 and <u>United States v. Nargi</u>, 732 F.2d 1102, 1105 (2d Cir. 1984)), <u>cert. denied</u>, 498 U.S. 1095 (1991). "When evaluating the reasonableness of a <u>Terry</u> stop, the reviewing court must consider 'the totality of the circumstances' surrounding the stop . . . [and] must evaluate those circumstances 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" <u>United States v. Bayless</u>, 201 F.3d 116, 133 (2d Cir.) (quoting <u>Sokolow</u>, 490 U.S. at 8, and <u>United States v. Oates</u>, 560 F.2d 45, 61 (2d Cir. 1977)), <u>cert. denied</u>, 529 U.S. 1061

(2000).

The officers in this case had information that Scott was in possession of a large quantity of crack cocaine and that he planned to be in the Olive Garden parking lot ready to participate in a transaction involving the drugs. According to Rossetti's report, the CS's relatively detailed information included the fact that Scott would be the "passenger" in a "wagon." When the officers observed Scott standing next to Rivera's blue wagon and talking to the driver, it was reasonable for them to have suspected that the blue wagon was the vehicle in which Scott had arrived and that the vehicle contained the contraband that Scott was reported to have brought to the location. It was also reasonable to suspect that the driver of the car was involved in the criminal activity.

Of course, "mere propinquity" to a suspect in a public place does not "without more" give rise to reasonable suspicion any more than it does probable cause. See United States v. Jaramillo, 25 F.3D 1146, 1152 (2d Cir. 1994). However, the officers' suspicions about Rivera and his vehicle were based on much more than his mere propinquity to Scott since, as discussed above, the officers had information about the kind of vehicle in which Scott was to arrive as a passenger. Rivera's argument that the officers had no information connecting him to the suspected drug activity is undermined by other key facts as well. At the time in question, the Olive Garden parking lot was relatively empty because the

restaurant was closed, thus making it somewhat less likely that members of the public who were not involved in the transaction would be present.  Also, the CS reported that the transaction was to occur at a very specific time and arranged to call Scott on his cell phone around that time.  The fact that Scott answered this call in the presence of Rivera supports the inference that Rivera was involved.  See United States v. Martinez-Molina, 64 F.3d 719, 729 (1st Cir. 1995) (dismissing the notion that "officers in the field are required to divorce themselves from reality or to ignore the fact that 'criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences'") (quoting United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992)).

It is clear that the officers possessed "specific articulable facts" that, together with rational inferences from these facts, gave rise to reasonable suspicion that Rivera and his vehicle were involved in criminal activity.  The officers were therefore justified in detaining the vehicle and its occupant for the purpose of determining whether their suspicions were accurate.  See United States v. Barlin, 686 F.2d 81, 87 (2d Cir. 1982) (holding that the search and detention of the defendant was justified by reasonable suspicion because she "was not innocuously present in a crowd at a public place" but, instead, "entered [the apartment] in tandem with [suspects] whose involvement in an ongoing narcotics transaction

seemed apparent"); United States v. Tehrani, 49 F.3d 54, 59-60 (2d Cir. 1995) (holding that a Terry-stop of the defendant at an airport was justified by reasonable suspicion regarding his traveling companion and inconsistencies between statements made by the defendant and statements made by his companion in response to questions posed by law enforcement agents). Indeed, some courts have found probable cause to be present in circumstances that are difficult to distinguish from the facts of this case. See United States v. Moreno, 897 F.2d 26, 31-32 (2d Cir.) (holding that the defendant's companionship with an individual known to be transporting cocaine, together with the defendant's nervousness and "odd" responses to officers' questions, gave rise to probable cause to arrest), cert. denied, Libreros v. United States, 497 U.S. 1009 (1990); United States v. Patrick, 899 F.2d 169, 171-72 (2d Cir. 1990) (holding that the discovery of cocaine in the defendant's traveling companion's purse, together with the fact that both individuals claimed to have accidentally crossed the border into Canada before returning to the United States, gave rise to probable cause to arrest the defendant).

After examining the exterior of the vehicle, the drug-sniffing dog alerted officers to the presence of narcotics. At this point, the officers had probable cause to conduct a full search of the vehicle and to continue to detain its occupant. See United States v. Glover, 957 F.2d 1004, 1013 (2d Cir. 1992) ("[O]nce the

narcotics dog 'hit on' [the defendant's] bags, the police had probable cause to obtain a search warrant.") (citing Florida v. Royer, 460 U.S. 491, 505-6 (1983); United States v. Waltzer, 682 F.2d 370, 374 (2d Cir. 1982), cert. denied, 463 U.S. 1210 (1983); United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994) ("When the dog "alerted positive" for the presence of drugs, the officer was given probable cause for the search [of the vehicle] that followed.").[1]

---

[1]The Court notes that some courts have held that an alert by a drug-sniffing dog may only be relied upon to establish probable cause if the government establishes the reliability of the dog. See, e.g., United States v. Diaz, 25 F.3d 392, 393-394 (6th Cir. 1994) ("A positive indication by a properly trained dog is sufficient to establish probable cause for the presence of a controlled substance, [but] [f]or a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established.") (citations omitted); United States v. Limares, 269 F.3d 794, 797-98 (7th Cir. 2001) (holding that an alert from a dog shown to be between 62 and 93 percent accurate is sufficient to establish probable cause); United States v. Sundby, 186 F.3d 873, 875-79 (8th Cir. 1999) (holding that a dog's reliability may be established with an affidavit "stat[ing] that the dog has been trained and certified to detect drugs"); United States v. Fernandez, 772 F.2d 495, 497 n. 2 (9th Cir. 1985). On the other hand, some courts have held that no showing of a dog's reliability is necessary; in particular, the Fifth Circuit has held that "a showing of the dog's reliability is not required if probable cause is developed on site as a result of a dog sniff of a vehicle." United States v. Williams, 69 F.3d 27, 28 (5th Cir.1995), cert. denied, 516 U.S. 1182 (1996). Thus far, the Second Circuit does not seem to have held that evidence of a drug-sniffing dog's reliability must be introduced before the government may rely on the dog's alert to establish probable cause, though the court in Walzer, 682 F.2d at 372, did note that the dog employed in the search at issue in that case "had a record of 100 percent accuracy." See also United States v. Johnson, 660 F.2d 21, 22-23 (2d Cir. 1981); United States v. Dillon, 810 F. Supp. 57, 61 (W.D.N.Y. 1992) (holding that a "formal recitation of a police dog's curriculum

Rivera also argues that the force initially used to detain him establishes that he was subjected to a full custodial arrest requiring probable cause. Seizures and investigations based on reasonable suspicion must be "reasonably related in scope to the justification for their initiation." Brignoni-Ponce, 422 U.S. at 881 (quoting Terry, 392 U.S. at 29). "A permissible investigative stop may become an unlawful arrest if the means of detention are 'more intrusive than necessary.'" Tehrani, 49 F.3d at 61 (quoting United States v. Perea, 986 F.2d 633, 644 (2d Cir. 1993), and citing Glover, 957 F.2d at 1011 and Posr v. Doherty, 944 F.2d 91, 98 (2d Cir. 1991)). In considering whether the encounter between an individual and the police rises to the level of a de facto formal arrest, the Court should consider, among other factors,

> (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of

---

vitae [is] unnecessary in the context of ordinary warrant applications"). However, the Court sees no need to determine whether or not the alert by the drug-sniffing dog in this case, on its own, gave rise to probable cause to search the defendant's car. First, Rivera has chosen not to challenge the reliability of the dog at this point. (See Def.'s Reply at 13 n. 3). Second, the probable cause to search the interior of Rivera's car was based on other factors in addition to the alert by the dog. See Johnson, 660 F.2d at 22 ("[T]the search warrants were not based on the dog's reactions alone; rather, the supporting affidavit discloses a variety of factors indicating that appellant might have been transporting drugs."). By the time the officers decided to search the interior of the car, they had confirmed that one of the individuals they had detained was Scott, but they had not yet located the crack cocaine they were searching for. Along with the other information known to the officers, these facts would have provided an additional reason to believe that the drugs were in the vehicle.

participating law enforcement officers; (4) the risk of
danger presented by the person stopped; and (5) the
display or use of physical force against the person
stopped, including firearms, handcuffs, and leg irons.

United States v. Newton, 369 F.3d 659, 674 (2d Cir. 2004)
(citations omitted).

Rivera correctly points out that the fact that the officers
ordered him to the ground and placed him in handcuffs weighs in
favor of a finding that he was arrested. See, e.g., Moreno, 897
F.2d at 31 (holding that "when [an officer] pushed [the defendant]
against the wall and told him not to move, he was performing an
arrest" but noting that the government had conceded that the
officers' actions amounted to a formal arrest); Oliveira v. Mayer,
23 F.3d 642, 645-47 (2d Cir. 1994) (holding that police arrested
defendants when, with no reasonable basis to assume the defendants
were armed, six officers who arrived in six vehicles drew their
guns, handcuffed the defendants, and forced them to lie on the
ground); United States v. Cebellos, 654 F.2d 177, 182-84 (2d Cir.
1981) (holding that officers arrested the defendant when they
blocked his car and approached him with guns drawn after they could
easily have performed a less intrusive Terry stop at an earlier
point in time).

However, the force used to restrain Rivera during the initial
stages of the encounter is not by any means dispositive of the
issue since "[t]here are no hard and fast rules for evaluating the
conduct of law enforcement agents conducting investigative stops."

13

See United States v. Alexander, 907 F.2d at 272 (United States. v. Nargi, 732 F.2d 1102, 1106 (2d Cir. 1984), and United States v. Harley, 682 F.2d 398, 402 (2d Cir. 1982)). Courts often find that encounters in which officers use handcuffs and/or draw their guns do not amount to de facto formal arrests. See, e.g., Newton, 369 F.3d at 676 (noting that the use of handcuffs "is generally recognized as a hallmark of a formal arrest" but holding that their use in that particular case did not convert the defendant's detention into a de facto arrest under the Fourth Amendment) (citations omitted); United States v. Glenna, 878 F.2d 967, 971 (7th Cir. 1989); United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992) (citing cases); Dempsey v. Town of Brighton, 749 F. Supp. 1215, 1223 (W.D.N.Y. 1990) ("[T]he handcuffing of a suspect does not convert a stop into an arrest"), aff'd, 940 F.2d 648 (2d Cir.), cert. denied, 502 U.S. 925 (1991).

The reasonableness of force used during an investigative detention varies with the particular circumstances of the stop. For example, "'where an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a de facto arrest." Newton at 674 (quoting Terry, 392 U.S. at 24); see also United States v. Vargas, 369 F.3d 98, 102 (2d Cir. 2004) ("[A]lthough under ordinary

circumstances, drawing weapons and using handcuffs are not part of a <u>Terry</u> stop, intrusive and aggressive police conduct is not an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.") (internal quotations omitted).

The Court does not believe that the officers' use of handcuffs to restrain Rivera after he was ordered out of the vehicle converted the encounter into a de facto formal arrest. While there is no evidence that the officers possessed specific information suggesting that either Scott or Rivera was armed, the Second Circuit "has repeatedly acknowledged the dangerous nature of the drug trade and the genuine need of law enforcement agents to protect themselves from the deadly threat it may pose." <u>Alexander</u>, 907 F.2d at 273 (citations omitted) (holding that police officers were reasonable, in the absence of any indication that the suspects were armed, in drawing their guns during the investigative stop of a vehicle suspected to contain drugs). Furthermore, the Supreme Court has "recognized that investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." <u>Michigan v. Long</u>, 463 U.S. 1032, 1047-48 (1983) (citing <u>Pennsylvania v. Mimms</u>, 434 U.S. 106 (1977), and <u>Adams v. Williams</u>, 407 U.S. 143 (1972)). In assessing the officers' actions, the Court is mindful of the Second Circuit's instruction that "the fact that an investigative stop might, in the abstract, have been

accomplished by some less intrusive means does not, in and of itself, render a stop unreasonable." Alexander, 907 F.2d at 273. For these reasons, the Court finds that it was not unreasonable to take these steps to restrain Scott and Rivera during the initial stages of the investigative stop.

In addition, other factors weigh in favor of a finding that the officers' actions were reasonable. A stop that occurs in a public setting is less likely to rise to the level of a formal arrest than an encounter that occurs in a private setting. See United States v. Forero-Rincon, 626 F.2d 218, 224 (2d Cir. 1980). Also, there is no evidence that the officers involved in this case drew their guns.[2] Finally, the duration of the stop weighs against a finding that it amounted to a formal arrest. "In assessing whether a detention is too long in duration to be justified as an investigative stop, [courts should] examine whether the police diligently pursued a means of investigation that was likely to

---

[2]In papers submitted in support of Rivera's motion to suppress, counsel for Rivera states that the officers drew their weapons. (See, e.g., Def.'s Reply at 2.) As reasonable as it may be to assume that guns were drawn at some point during this encounter, this fact is absent from the law enforcement reports on which the defendant relies to establish the facts on which his argument for suppression is based. A claim made by a lawyer without personal knowledge of events in question is insufficient to establish a factual dispute for the Court to resolve. See United States v. Ahmad, 992 F. Supp. 682, 685 (S.D.N.Y. 1998) ("[O]rdinarily [a factual issue must] be raised by an affidavit of a person with personal knowledge of the facts," and otherwise "there is no basis for holding an evidentiary hearing or suppressing the evidence.") (citing United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967)).

confirm or dispel their suspicions quickly . . ." <u>United States v. Sharpe</u>, 470 U.S. 675, 686 (1985) (citations omitted). By causing a drug-sniffing dog to examine the exterior of the vehicle, the officers in this case took prompt action, using minimally intrusive means, to confirm or dispel their suspicions. <u>See</u> <u>Glover</u>, 957 F.2d at 1013 (holding that a dog sniff is a "minimally intrusive means of confirming or dispelling . . . suspicion") (citing <u>Place</u>, 462 U.S. at 707); <u>see also</u> <u>Haynie v. County of Los Angeles</u>, 339 F.3d 1071, 1076 (9th Cir. 2003) (holding that it was reasonable to keep a defendant handcuffed in the rear of a police car for sixteen to twenty minutes while an officer searched the defendant's vehicle).

An additional reason to reject Rivera's argument that the force used to restrain him necessitates suppression of the evidence is that the physical evidence seized from the blue wagon was not the fruit of Rivera's allegedly unlawful detention. The officers' reasonable suspicion that the vehicle contained drugs entitled them to briefly detain Rivera and, with the assistance of the drug-sniffing dog, examine the exterior of the vehicle. The physical evidence is the fruit of the search of the vehicle and its discovery has nothing to do with the means used to detain Rivera. <u>See</u> <u>United States v. Moore</u>, 329 F.3d 399, 403-405 (5th Cir. 2003) (applying the independent source doctrine and holding that evidence found in the defendant's car in a search during which the defendant claimed to have been unlawfully handcuffed was not the fruit of the

defendant's allegedly unreasonable detention). The officers would have discovered the drugs and would eventually have arrested Rivera regardless of whether they had handcuffed and forced him to lie on the ground or had used some less intrusive means to effect an investigative detention. It simply cannot be said that the drugs discovered in the blue wagon have "been come at by exploitation of the [alleged] illegality" of which Rivera complains. See United States v. Thompson, 35 F.3d 100, 105 (2d Cir. 1994) (quoting Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)); see also Hudson v. Michigan, 547 U.S. 586, 592 (2006) (noting that a necessary condition for the suppression of evidence is that the constitutional violation was the "'but-for' cause of obtaining [the] evidence"). Therefore, even if Rivera were correct that the means used to restrain him were unreasonably intrusive, this would not require suppression of the evidence uncovered in the search of his car.

B. Rivera's Statements and Physical Evidence Found in the Search of the Hotel Room

Rivera argues that the statements he made at the police station must be suppressed as the fruits of his allegedly unlawful seizure in the Olive Garden parking lot. He also argues that the physical evidence discovered in his Maine hotel room was the fruits of these statements and must, accordingly, be suppressed.

The Court has found that the officers' seizure of Rivera and his vehicle was initially justified by reasonable suspicion and

then, after the dog alerted officers to the presence of drugs in the car, by probable cause. Suppression of the fruits of the initial investigative detention is therefore not warranted.

C. Evidentiary Hearing

Rivera requests an evidentiary hearing on his motion to suppress. The Court sees no need to conduct a hearing as the parties have not drawn the Court's attention to any factual dispute. See United States v. Fruchter, 104 F. Supp. 2d 289, 308 (S.D.N.Y. 2000) ("A motion to suppress does not require a hearing unless there is a factual dispute.") (citing United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992)). The defendant, like the government, relies entirely on the version of events supplied by Agent Rossetti's reports. The defendant's sole argument for suppression is that "even under the agents' version of events, Mr. Rivera was stopped and his vehicle was searched illegally." (Def.'s Mem. in Supp. at 1; see also Def.'s Reply at 1 ("It is the defendant's position, supported by the police reports attached to his original memorandum . . . , that the agents' initial armed 'take down' and handcuffed detention of Mr. Rivera constituted an unlawful arrest . . . ").)

Rivera argues that he is entitled to a hearing because "on a motion to suppress on the ground of illegal arrest without a warrant the burden is on the Government to show that there was probable cause for the arrest." See Pena, 961 F.2d at 339.

However, Rivera ignores the rule that he bears a burden of production. <u>United States v. Arboleda</u>, 633 F.2d 985, 993 (2d Cir. 1980) (citing the "general rule that the moving party in a suppression hearing has the burden of production and persuasion" but pointing out that "when a defendant has produced sufficient evidence that he was arrested or subjected to a search without a warrant, the federal rule is that the burden shifts to the government to justify the warrantless arrest or search") (citations omitted); <u>see also</u> <u>United States v. Gregory</u>, 611 F. Supp. 1033, 1044 (S.D.N.Y. 1985) (holding that the defendant had "failed to raise a factual issue concerning the validity of the seizure and [was] not entitled to a suppression hearing").

In his Reply to the government's Memorandum, Rivera attempts to create a number of factual disputes. In particular, he disputes certain conclusory statements made by the government in its Memorandum. (<u>See</u> Def.'s Reply at 12.) The Court has relied only on facts drawn from the law enforcement reports attached to Rivera's Memorandum and has not relied on facts set out in the government's papers. Therefore, these belatedly manufactured factual disputes are immaterial.

Rivera also argues that he is entitled to a hearing at which he could learn about the agents' investigation, "probe the reliability of the [CS]," and "present evidence of his own." (<u>Id.</u> at 13.) However, the Court is not required to grant Rivera an

evidentiary hearing absent a showing by him that there are factual disputes related to these issues.  See Pena, 961 F.2d at 339 (2d Cir. 1992) ("An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question"); United States v. Culotta, 413 F.2d 1343, 1345 (2d Cir. 1969) ("[The district court] was not required as a matter of law to hold an evidentiary hearing if [defendants's] moving papers did not state sufficient facts which, if proven, would have required the granting of the relief requested by appellant.") (citing Grant v. United States, 282 F.2d 165, 170 (2d Cir. 1960), and Wright, Federal Practice and Procedure § 675 (1969)).  Rivera has failed to make such a showing with any level of specificity.  Therefore, a hearing is not required.

CONCLUSION

For the foregoing reasons, the defendant's motion to suppress [Doc. No. 24] is DENIED.

SO ORDERED.

_____/s/_____
ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE


Dated at New Haven, Connecticut this 27th day of May, 2008.